# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: <br><br> REGEN BIOLOGICS, INC., <br><br> Debtor. | Case No. 11-11083 (PJW) <br><br> Chapter 11 |
| In Re: <br><br> RBIO, INC., <br><br> Debtor. | Case No. 11-11084 (PJW) <br><br> Chapter 11 <br><br> (Joint Administration Requested) |

## DECLARATION OF JOHN DICHIARA IN SUPPORT OF CERTAIN OF DEBTORS' PENDING MOTIONS AND APPLICATIONS

I, John Dichiara, under penalty of perjury, hereby declare as follows:

1. My name is John Dichiara. I am over the age of eighteen and competent to testify about the matters contained herein. I make this Declaration based upon my personal knowledge.

2. I am the Senior Vice President, Clinical and Regulatory Affairs of ReGen Biologics, Inc. ("ReGen")[1] and the Vice President, Secretary and Treasurer of RBIO, Inc. ("RBIO" and together with ReGen, the "Debtors"). I am authorized to make and submit this declaration on behalf of the Debtors. RBIO is wholly owned by ReGen.

3. I submit this Declaration in support of the following (collectively, the "Pleadings"):

---

[1] All initially capitalized terms not otherwise defined have the meanings given them in the Bid Procedures Motion.

1

a. Motion for Order (I) Approving Bid Procedures Relating to Sale of All or Substantially All of the Assets of the Debtors; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Manner of Notices; (III) Approving Break-Up Fee Provision; (IV) Establishing Certain Notice Procedures for Determining Cure Amounts for Executory Contracts and Leases to Be Assigned; and (V) Granting Related Relief [D.E. 29, D.E. 23][2] ("Bid Procedures Motion");

b. Motion of Debtors for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Sale of All of Substantially All of Their Assets; (II) Approving and Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [D.E. 28, D.E. 22] ("Asset Sale Motion");

c. Motion of the Debtors for a Final Order Authorizing DIP Financing, Authorizing the Use of Cash Collateral, and Granting Adequate Protection [D.E. 23, D.E. 17] ("DIP Motion");

d. Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses [D.E. 26, D.E. 20] ("Interim Compensation Motion");

e. Application for Authority to Employ and Retain Pillsbury Winthrop Shaw Pittman LLP as Debtors' Bankruptcy Co-Counsel [D.E. 4, D.E. 4] ("Pillsbury Application");

f. Application for Authority to Employ and Retain Phillips, Goldman & Spence, P.A. as Debtors' Bankruptcy Co-Counsel [D.E. 5, D.E. 5]("PG&S Application"); and

g. Application for Authority to Employ and Retain Gibbons P.C. as Special Counsel [D.E. 27, D.E. 21] ("Gibbons Application").[3]

4. On April 8, 2011 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[2] Docket entry ("D.E.__) references are first to ReGen and second to RBIO.

[3] Debtors' Motion for Order Directing Joint Administration of Chapter 11 Cases is supported by the Declaration of Gerald E. Bisbee, Jr.

5. The Pleadings are intended to enable the Debtors to operate effectively and efficiently during these chapter 11 cases, as well as avoid certain adverse consequences that might otherwise result from the commencement of such cases. Among other things, the Pleadings seek relief aimed at obtaining postpetition financing and pursuing a sale process to preserve value that would otherwise quickly erode. I have reviewed the Pleadings, and it is my belief that the relief sought therein is necessary to ensure the operations of the Debtors' business and maximize and preserve the value of the Debtors' chapter 11 estates.

6. In my capacity as Senior Vice President, Clinical and Regulatory Affairs, of ReGen, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team or certain professionals retained by the Debtors, or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon, I could and would testify competently to the facts set forth herein.

7. Part I of this Declaration provides an overview of the Debtors' business as well as the Debtors' plan for these cases. Part II provides a discussion of the events that compelled the commencement of these chapter 11 cases. Part III provides a description of the Debtors' corporate and capital structures. Part IV affirms and incorporates the facts that support the relief requested in the Pleadings.

## PART I

## Debtors' Business Operations

8. The Debtors develop, manufacture and market tissue growth and repair products. Their main product is a meniscus implant known as "Menaflex." This implant facilitates tissue growth, thereby reinforcing and repairing the damaged meniscus of the knee. The Menaflex device (also known as the CMI(R)) is manufactured by the Debtors in the United States. The Menaflex device was approved for marketing in the European Union in 2000 and is currently marketed for sale in the European Union, Switzerland and the Republic of South Africa. Although the U.S. Food and Drug Administration (the "FDA") cleared the Menaflex device for marketing in the U.S. in December 2008, in October 2009 the FDA initiated a re-review of the device clearance and on October 14, 2010, concluded that the 510(k) clearance for the Menaflex device was issued in error. On March 30, 2011, the Debtors received official notice from the FDA that the 510(k) clearance for the Debtors' Menaflex device has been rescinded. Although marketing of the device in the United States had already been significantly curtailed due to the impact of the FDA re-review, as a result of the final rescission order, the Debtors immediately discontinued commercial distribution of the Menaflex device in the United States.

9. The Debtors also sell the SharpShooter® Tissue Repair System, or SharpShooter, a suturing device used to facilitate the surgical implantation of the Menaflex device, as well as to perform other similar arthroscopic meniscus repair procedures. The SharpShooter is currently sold through a worldwide non-exclusive distribution agreement with ConMed Linvatec and outside the U.S., through the Debtors' wholly-owned Swiss subsidiary, ReGen Biologics AG. The SharpShooter is legally

marketed in the U.S., the European Union, Canada, Australia, Chile, the Republic of South Africa, and Japan.

10. Due to lack of resources, the Debtors discontinued production of Menaflex in 2009 and intend to re-commence the production of the Menaflex device during these bankruptcy proceedings. Through funds made available prior to the Petition Date and the proposed DIP Facility, the Debtors are purchasing raw materials and rebuilding relationships with vendors who are necessary to the production side of the Debtors' business. The Debtors believe that these efforts will help attract buyers and will ultimately maximize the value of their assets.

## PART II

### Events Leading to Bankruptcy

11. In recent years, in large part due to uncertainties relating to whether the FDA would rescind its clearance of the Menaflex product, the Debtors experienced difficulty obtaining sufficient equity or debt financing to produce the Menaflex product, pursue legal or regulatory recourse regarding the FDA's actions and effectively market their products in the U.S. and other markets. The Debtors' efforts to obtain financing have been hindered by their failure, due to lack of resources, to support the production of audited financial statements for periods subsequent to December 31, 2008 or to file annual or quarterly reports with the Securities and Exchange Commission since the quarter ended June 30, 2009. Because of the Debtors' resource limitations, they have not produced the Menaflex product for over a year. The Debtors have weighed various strategic alternatives, but unfortunately have been unsuccessful in obtaining sufficient funding to accomplish their objectives.

12. The Debtors' financial situation was aggravated by litigation commenced by one of the Debtors' vendors, Off Madison Avenue, Inc. ("Off Madison"). Off Madison commenced a state court proceeding against ReGen for failure to meet certain payment obligations and obtained a default judgment against ReGen in the amount of approximately $28,000 plus interest. Off Madison has received a judgment lien against assets of ReGen as well as a collateral assignment of certain of the patents and trademarks of ReGen. Off Madison's judgment lien is junior to the liens of the Debtors' Prepetition Lien Holders (defined below).

## PART III

### Prepetition Capital Structure

13. On October 2, 2009, certain investors (the "Bridge A Investors") entered into that certain Subscription and Security Agreement dated as of October 2, 2009 with ReGen, which was amended and restated as of June 15, 2010 (the "Bridge A Notes Agreement"). ReGen's obligations under the Bridge A Notes Agreement are secured by substantially all of ReGen's assets. ReGen is indebted to the Bridge A Investors in the amount of approximately $3.8 million.

14. On September 30, 2010, certain investors (the "Bridge B Investors") entered into that certain Subscription and Security Agreement with ReGen, which was amended and restated as of December 27, 2010 (the "Bridge B Notes Agreement"). ReGen's obligations under the Bridge B Notes Agreement are secured by substantially all of ReGen's assets. ReGen is indebted to the Bridge B Investors in the amount of approximately $888,000. The Bridge A Investors and the Bridge B Investors have appointed Sanderling Management Company, LLC ("Sanderling") to enforce their rights in their collateral.

15. ReGen entered into Credit Agreements dated as of November 30, 1998 and March 14, 2000 (collectively, the "Zimmer Notes Agreement") with Sulzer Medica USA Holding Company, the predecessor-in-interest of Zimmer Holdings, Inc. ("Zimmer"). Obligations under the Zimmer Notes Agreement are secured by specified assets of the Debtors. ReGen is indebted to Zimmer in the amount of approximately $9 million under the Zimmer Notes Agreement, which figure includes accrued and unpaid interest.

16. Sports Medicine Holding Company, LLC ("Sports Medicine") and ReGen entered into that certain Subscription and Security Agreement dated as of March 11, 2011 and amended as of April 7, 2011 pursuant to which Sports Medicine may lend up to $1,000,000 to ReGen (the "Newco Notes Agreement"). ReGen's obligations under the Newco Notes Agreement are secured by substantially all of ReGen's assets and are senior to the liens of Sanderling and, other than with respect to specified assets, Zimmer. ReGen is indebted to Sports Medicine in the principal amount of approximately $902,000 under the Newco Notes Agreement. (Sanderling, Zimmer and Sports Medicine together are the "Prepetition Lien Holders.")

17. Sanderling, Zimmer and Ivy Healthcare Capital II, L.P., currently the controlling member of Sports Medicine, collectively own approximately 45% of ReGen's common stock.

18. Sports Medicine has agreed to terms on which it will provide the Debtors with debtor in possession financing (the "DIP Facility"). The DIP Facility will provide the Debtors with liquidity as they pursue a sale of their assets.

## PART IV

### Facts Relevant to the Pleadings

19. Generally, the Pleadings have been designed to meet the Debtors' goals of: (a) operating their business in chapter 11 and securing the confidence and support of their vendors, suppliers and service providers during the Debtors' sale process; (b) obtaining postpetition financing and pursuing a sale process; and (c) employing professionals and establishing procedures for the smooth and efficient administration of these chapter 11 cases.

20. I have reviewed and discussed with Debtors' counsel each of the Pleadings and incorporate by reference the factual statements set forth in the Pleadings. It is my belief that the relief sought in each of the Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their estates.

### Bid Procedures Motion

21. Over the last several years, the Debtors have aggressively solicited interested parties to make substantial equity or debt investments in the Debtors or their affiliate, ReGen Biologics AG, and, to a lesser extent, have solicited interest in purchasing the Debtors. The Debtors have been in contact with scores of individuals and entities in connection with these efforts. As a result of these contacts, various groups requested further information, which the Debtors provided, and the Debtors were able to obtain some (but insufficient) additional debt financing. It became clear, unfortunately, that there were no available investors or buyers willing to (i) provide sufficient financing to fund the Debtors' ongoing operations and pay amounts owing to Prepetition Lien Holders or (ii) purchase the Debtors' assets for an amount that would pay off the

Prepetition Lien Holders in full. Therefore, the Debtors have concluded that the sale of their assets in bankruptcy with a competitive auction process will maximize the value of their assets for the benefit of creditors.

22. The Debtors intend to enter into the Purchase Agreement for the sale of all or substantially all of their assets to Sports Medicine, subject to higher and better bids and Court approval. In exchange for the sale of their assets to Sports Medicine, the Debtors' secured debt and any claims of the Prepetition Lien Holders and of Sports Medicine under the DIP Facility (in such capacity, the "DIP Lender") will be deemed satisfied and certain of the Debtors' vendors contracts will be assumed.

23. To facilitate the sale, the Debtor, Sports Medicine and the other Prepetition Lien Holders have entered into Exchange Agreements, dated as of March 30, 2011 (the "Exchange Agreements"). Under the terms of the Exchange Agreements, the Debtors' Prepetition Lien Holders have agreed to allow Sports Medicine to "credit bid" the amount of their secured debt and consent to the terms of the sale of the Debtors' assets and business to Sports Medicine, subject to higher and better bids. In the event the sale to Sports Medicine is approved by the Court and closes, the Prepetition Lien Holders will exchange their holdings of the Debtors' secured debt for equity interests in Sports Medicine.

24. The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence a bidding process immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. Indeed, the DIP Facility is available only for a finite period of time. Although the Debtors are operating on reduced expenses, it is unlikely they will be able to continue operating

beyond the period of this proposed bidding process without additional funding, the source of which would be uncertain.

25. The Debtors believe that implementation of the Bidding Procedures will not chill the bidding (if any) for all or portions of the Purchased Assets (defined below). Quite the contrary, approval of the Bidding Procedures is in the best interests of the Debtors, their estates and their creditors in that the Bidding Procedures provide a structure and format for other potentially interested parties to formulate a bid for all or portions of the Purchased Assets (defined below) or other assets of the Debtors.

**Asset Sale Motion**

26. The material terms of the business deal between the Debtors and Sports Medicine are that Sports Medicine has agreed, if not outbid at the Auction, to purchase (the "Sale") substantially all of the Debtors' assets (the "Purchased Assets"), free and clear of liens (if any), claims, encumbrances, and interests (collectively referred to as "Encumbrances"), with such Encumbrances (other than those of the Prepetition Lien Holders and the DIP Lender, if Sports Medicine is the Successful Bidder) to attach to the proceeds of the Sale Transaction, if any.

27. The Debtors evaluated the terms of Sports Medicine's offer with the assistance of their professionals and, in their reasoned business judgment, concluded that Sports Medicine's proposal offered the best opportunity to initiate a sale process that will maximize creditor recoveries (both in terms of purchase price and in terms of rebuilding production operations). The Debtors have marketed and will continue marketing their assets and business in an effort to solicit further interest from both strategic acquirers and financial buyers and investors. The Purchase Agreement is subject to higher or better

offers and is conditioned in part upon Sports Medicine receiving the bid protections described in the Bid Procedures Motion.

28. The Debtors have no production operations and urgent cash needs. Sports Medicine has agreed to provide for enough funding to allow the Debtors to rebuild their production operations, but the funding is not unlimited and will expire by late-June 2011. The rebuilding of the production operations, combined with a sale of the Debtors' assets, will help restore confidence with those entities with whom the Debtors have done business. Thus, the Debtors submit that the value of their assets will be maximized if their assets are immediately marketed and sold.

29. In short, an asset sale is the proper response to the challenges the Debtors face in attempting to maximize the value of their estates. The Purchased Assets are likely to generate the highest returns if the Debtors' business is sold to an entity (like the Purchaser) with access to capital and a clear motivation to continue, and improve, the Debtors' operations.

## **DIP Motion**

30. The Debtors' current cash position will run out around May 13, 2011. The only cash that the Debtors have after that time is cash funding by Sports Medicine, as DIP Lender. Sports Medicine has agreed to provide for enough funding to allow the Debtors to rebuild their production operations as the Debtors seek to sell their assets through competitive bidding at an auction (if there is an auction). Sports Medicine will be the "stalking horse" bidder at that auction. The Debtors were not able to obtain credit on comparable or more favorable terms elsewhere. The DIP credit agreement is fair and reasonable and provides significant new liquidity for the Debtors. It will thus enable the

Debtors to preserve their assets, and to pursue and consummate a Sale of the Purchased Assets.  Without the financing provided for in the DIP credit agreement, the Debtors would suffer irreparable harm, which would jeopardize their prospects of completing a Sale, and would probably cause them to have to liquidate their assets—a result that would benefit none of the constituents the Bankruptcy Code is designed to protect.

31. The Debtors understand that the Prepetition Lien Holders consent to the Debtors' use of cash collateral as set forth in the Final Order (attached to the DIP Motion).  As a condition to obtaining this consent and in satisfaction of section 363(e) of the Bankruptcy Code, the Debtors will adequately protect the Prepetition Lien Holders by giving them superpriority claims under section 507(b) of the Bankruptcy Code ("<u>Superpriority Claims</u>"), as well as additional and replacement security interests in and liens ("<u>Replacement Liens</u>") upon all or substantially all of the Debtors' assets, including cash collateral, as well as currently owned and after-acquired real and personal property, assets and rights, of any kind or nature, wherever located, and the proceeds, products, rents and profits thereof.

## **Interim Compensation Motion**

32. The Debtors believe the compensation procedures requested in the Interim Compensation Motion will (i) reduce the burden on the Court imposed by alternative interim compensation procedures that require monthly court orders, (ii) enable parties in interest to monitor professionals' fees and costs in these cases more closely, and (iii) reduce undue financial burdens on the professionals.  Accordingly, the compensation procedures are in the best interests of the Debtors, their estates, creditors, and other parties in interest.

## Pillsbury Application

33. For several years, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") has been providing legal services to the Debtors. More recently, the Debtors specifically retained Pillsbury to prepare, commence, and prosecute the Debtors' chapter 11 proceedings and to represent the Debtors in connection with matters incidental thereto. During the weeks before the Petition Date, Pillsbury provided services to the Debtors that were necessary to preserve the Debtors' assets, and to prepare the Debtors for their bankruptcy filings and the anticipated Court-supervised sale of their assets.

34. The Debtors also seek to retain Pillsbury as bankruptcy counsel because of Pillsbury's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Pillsbury is also familiar with the potential legal issues which may arise during the Debtors' chapter 11 cases because of Pillsbury's non-bankruptcy representation of the Debtors.

35. Since approximately February 1, 2011, Pillsbury has been advising the Debtors with respect to their restructuring and potential bankruptcy cases. During Pillsbury's prepetition bankruptcy-related representation of the Debtors, Pillsbury worked with the Debtors' management and other professionals to prepare the chapter 11 petitions and the various motions filed on the Petition Date. As a result, and because of Pillsbury's non-bankruptcy representation of the Debtors, Pillsbury has developed knowledge of the Debtors' business operations, financial affairs, corporate and capital structures and related matters. Accordingly, it would be in the best interests of the estates for the Debtors to continue to retain Pillsbury throughout the bankruptcy process.

### PG&S Application

36. Prepetition, the Debtors retained Phillips, Goldman & Spence, P.A. ("PG&S"), as local Delaware counsel, to prepare, commence, and prosecute the Debtors' chapter 11 proceedings and to represent the Debtors in connection with matters incidental thereto, together with lead bankruptcy counsel Pillsbury. In connection with the filing of the Debtors' bankruptcy petitions, PG&S provided services to the Debtors that were necessary to prepare the Debtors for their bankruptcy filings.

37. The Debtors also seek to retain PG&S as local bankruptcy counsel because of PG&S' extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, and particularly PG&S' knowledge of the local rules and practices applicable in the United States Bankruptcy Court for the District of Delaware.

38. During the days prior to the Petition Date, PG&S has been working with Pillsbury and the Debtors to prepare the chapter 11 petitions and the various motions filed on and after the Petition Date. As a result, PG&S has developed knowledge of the Debtors' business operations and financial affairs. Accordingly, it would be in the best interests of the estates for the Debtors to continue to retain PG&S throughout the bankruptcy process.

### Gibbons Application

39. Prepetition, Gibbons P.C. ("Gibbons") was retained to challenge the FDA's rescission of its 510(k) authorization with respect to the marketing and distribution of the Menaflex collagen meniscus implant.

40. Gibbons has extensive experience and knowledge in the fields of pharmaceutical and intellectual property matters, as well as federal appellate practice. Gibbons is also familiar with the potential legal issues that may arise in connection with obtaining and maintaining FDA approval of the Debtors' medical device products. As a result of its prepetition representation, Gibbons has developed knowledge of the FDA proceedings and the issues raised therein pertaining to Debtors' medical device products, specifically the Menaflex device, expertise which would be difficult and expensive for new counsel to develop. Thus, Gibbons' experience, background, and knowledge of the Debtors and their medical device products allows Gibbons to continue representing the Debtors in an effective and efficient manner that best serves the estates' interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: April 25, 2011

_____
John Dichiara
Senior Vice President, Clinical and
Regulatory Affairs of ReGen Biologics, Inc.
and Vice President, Secretary and Treasurer
of RBIO, Inc.